# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**SHELLEY CHAPMAN, et al.,**                    **Case No. 1:23-cv-00991**

                **Plaintiffs,**

       **-vs-**                    **JUDGE PAMELA A. BARKER**

**CHRISTINE SEUFFERT, et al.,**

                **Defendants.**        **MEMORANDUM OPINION & ORDER**

Before the Court are two motions to dismiss.  First is Ashtabula Area City School Board of Education's ("Ashtabula") Motion to Dismiss Plaintiffs' claims under Rule 12(b)(6) filed on July 21, 2023.  (Doc. No. 10.)  On August 24, 2023, Plaintiffs filed a Joint Memorandum in Opposition to Ashtabula's Motion.  (Doc. No. 17.)  And, on September 7, 2023, Ashtabula filed a Reply in support of its Motion.  (Doc. No. 19.)

Second is Defendant Christine Seuffert's ("Seuffert") Motion to Dismiss Plaintiffs' claims under Rules 12(b)(1), (6), and (7) filed on November 13, 2023.  (Doc. No. 23.)  On December 8, 2023, Plaintiffs filed a Joint Memorandum in Opposition to Seuffert's Motion.  (Doc. No. 25.)  Seuffert did not file a reply.

For the following reasons, the Court GRANTS Ashtabula's Motion to Dismiss Plaintiffs' federal claims under Rule 12(b)(6).  The Court GRANTS IN PART Seuffert's Motion to Dismiss to the extent she joins Ashtabula's Motion to Dismiss under Rule 12(b)(6), but it DENIES IN PART Seuffert's Motion to Dismiss under Rules 12(b)(1) and (7).  Lastly, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state-law claims.

I.      **Factual Allegations**

Plaintiffs set forth the following factual allegations in their Complaint.  (Doc. No. 1.)

A.      **The Parties**

Plaintiff Shelley Chapman ("Chapman") was a student at Ashtabula High School from the fall of 1985 until the spring of 1988.  (*Id*. at ¶ 18.)  She played on the girls' basketball and volleyball teams and ran track.  (*Id*.)  After graduating, Chapman coached volleyball at Ashtabula as an assistant coach.  (*Id*.)

Plaintiffs Sean Allgood ("Allgood"), Nathaniel Jones ("Jones"), Adrian Mathers ("Mathers"), Andre Miller ("Miller"), and Brian Scruggs ("Scruggs") (together, the "Male Plaintiffs") were all students at Ashtabula High School between 1985 and 1990.[1]  (*Id*. at ¶¶ 19-23.)  They played on the school's football and basketball teams.  (*Id*.)  Allgood also ran track.  (*Id*. at ¶ 19.)

"During the relevant time periods," all Plaintiffs were minors and had not yet turned eighteen. (*Id*. at ¶¶ 18-23.)

Seuffert was a teacher and volleyball coach while Plaintiffs were students at Ashtabula High School.  (*Id*. at ¶ 24.)

B.      **Seuffert's Alleged Abuse of the Male Plaintiffs**

Around 1987 to 1988, Chapman and Miller began spending time together.  (*Id*. at ¶ 25.) Chapman was already friendly with Seuffert at this point, and she began taking Miller with her when she visited Seuffert's house.  (*Id*.)  Seuffert provided Chapman and Miller alcohol when they visited.

---

[1]  Adrian Mathers began attending Ashtabula High School in 1985 and graduated in 1989.  (Doc. No. 1, ¶ 21.)  The remaining Male Plaintiffs attended from 1986 to 1990.  (*Id*. at ¶¶ 19, 20, 22, 23.)

2

(*Id*. at ¶ 26.)  Miller saw that Seuffert and Chapman had an "intimate, sexual relationship." (*Id*. at ¶ 27.)

Miller told his friends—Allgood, Jones, Mathers, and Scruggs—that Seuffert gave him alcohol when he went over to her house.  (*Id*. at ¶ 28.)  Allgood, Jones, Mathers, and Scruggs then also started going over to Seuffert's house.  (*Id*. at ¶ 29.)  Seuffert provided them alcohol too when they visited.  (*Id*.)  Plaintiffs went to Seuffert's house "several times per week, especially following sporting events." (*Id*. at ¶ 30.)

Eventually, Seuffert allowed Plaintiffs to go to her house when she was not there.  (*Id*. at ¶ 31.)  Seuffert also let Plaintiffs use her vehicle.  (*Id*. at ¶ 32.)  Over time, Seuffert "became more and more promiscuous" with Plaintiffs.  (*Id*. at ¶ 33.)  Seuffert flirted with Mathers, Miller, and Scruggs and "engaged in physical acts such as touching their buttocks." (*Id*. at ¶ 34.)  Seuffert "encouraged Allgood to touch and fondle her breasts and buttocks." (*Id*. at ¶ 35.)  Seuffert performed oral sex on Jones "on two or three different occasions." (*Id*. at ¶ 37.)

### C.    The Basketball Coaches

Rumors started spreading around Ashtabula High School about the "gatherings, drinking, and sexual activity" at Seuffert's house.  (*Id*. at ¶ 38.)  The head boys' basketball coach heard these "allegations/rumors" that Seuffert was providing alcohol and sex to high school students, including the Male Plaintiffs, all of whom played on the basketball team.  (*Id*. at ¶ 39.)  The head coach "threatened to suspend the [Male Plaintiffs] from the [basketball] team if the allegations/rumors were true." (*Id*.)  When asked, the Male Plaintiffs "denied that the allegations/rumors were true." (*Id*. at ¶ 44.)  The assistant boys' basketball coach also heard the "allegations/rumors" that Seuffert was providing alcohol to high school students, including the Male Plaintiffs.  (*Id*. at ¶ 40.)

Ashtabula, "through its employees and/or agents, threatened the [Male Plaintiffs] to keep their mouths shut," but it did not investigate or report Seuffert.  (*Id*. at ¶ 41.)  Around 1989 or 1990 and after the head coach's threat of suspension, the Male Plaintiffs stopped going to Seuffert's house, using her vehicle, drinking her alcohol, and engaging in sexual activity with her.  (*Id*. at ¶¶ 45, 46.)  The Male Plaintiffs "kept . . . quiet" and "did not speak about" Seuffert's actions in the succeeding decades.  (*Id*. at ¶ 47.)

### D.     Seuffert's Alleged Abuse of Chapman

Chapman met Seuffert during her sophomore year of high school.[2]  (*Id*. at ¶ 49.)  Seuffert was Chapman's home room teacher.  (*Id*. at ¶ 50.)  Chapman occasionally returned to Seuffert's classroom during her lunch period to "decompress."  (*Id*. at ¶ 51.)  While there, Chapman talked with Seuffert, and Seuffert learned that Chapman was "emotionally vulnerable."  (*Id*. at ¶ 53.)  Chapman's parents separated the year prior, "which was taking a toll on Chapman's mental and emotional wellbeing." (*Id*.)  Chapman visited Seuffert's classroom more frequently as the school year progressed.  (*Id*. at ¶ 55.)  Chapman began to trust Seuffert and revealed "personal details about her home life."  (*Id*. at ¶¶ 56, 57.)

At the end of the school year, Seuffert asked Chapman about her plans for summer break.  (*Id*. at ¶ 58.)  Chapman said that she liked to ride her bike to the beach.  (*Id*.)  Seuffert responded that she lived close to Chapman's bike path and invited Chapman to stop by her house.  (*Id*. at ¶ 59.)  During

---

[2]  The Court notes that while Plaintiffs' Complaint appears to be plead chronologically, the timeline is unclear.  It begins with Seuffert's alleged abuse of the Male Plaintiffs, which it asserts "ceased in or around 1989-90." (Doc. No. 1, ¶ 46.)  The Complaint then continues with the allegation that "[u]nfortunately for Shelley Chapman, Seuffert's exploitation of her continued even after the male Plaintiffs were able to escape her grip."  (*Id*. at ¶ 48.)  This suggests that Seuffert's alleged abuse of Chapman continued after 1989 or 1990 and that Chapman was still a minor and in high school at that time.  Yet earlier in the Complaint, Plaintiffs allege that Chapman graduated in 1988.  (*Id*. at ¶ 18.)

4

the summer, Chapman occasionally rode her bike to Seuffert's house and talked with Seuffert outside. (*Id*. at ¶ 62.)  Chapman's trust in Seuffert continued to grow.  (*Id*. at ¶ 63.)  During one visit, Seuffert gave Chapman her phone number.  (*Id*. at ¶ 62.)  Chapman and Seuffert began to talk on the phone at night.  (*Id*. at ¶ 64.)  The length of the calls increased as the summer progressed.  (*Id*.)

During Chapman's junior year of high school, she played for the girls' varsity volleyball team. (*Id*. at ¶¶ 65, 66.)  Seuffert was the teams' head coach.  (*Id*. at ¶ 65.)  Seuffert occasionally invited Chapman to drive home from the volleyball games with her; Chapman agreed.  (*Id*. at ¶ 69.)  Chapman also continued to ride her bike to Seuffert's house.  (*Id*. at ¶ 72.)  Now, Seuffert invited Chapman inside and occasionally they had dinner together.  (*Id*.)  Several times, Seuffert gave Chapman wine and encouraged her to drink.  (*Id*. at ¶ 73.)  At school, Seuffert gave Chapman "hall and/or late passes . . . so often that various teachers stopped accepting passes from Seuffert."  (*Id*. at ¶ 74.)

Chapman also played basketball during her junior year.  (*Id*. at ¶ 75.)  Seuffert was not associated with the girls' basketball team, so Chapman and Seuffert did not see each other as they did during volleyball season.  (*Id*. at ¶ 76.)  Seuffert began talking with Chapman more often at night, both in-person at her house and on the telephone.  (*Id*. at ¶ 77.)

Chapman and Seuffert also spent time together on Saturdays.  (*Id*. at ¶ 78.)  Seuffert picked up Chapman from "Martell's Cleaner's," which was down the road from where Chapman lived, and brought Chapman back to her house.  (*Id*. at ¶ 78.)  At first, Chapman and Seuffert sat on the couch and watched television or movies together.  (*Id*. at ¶ 79.)  As time progressed, they began sitting closer together.  (*Id*. at ¶ 80.)  Seuffert eventually began "cuddling" Chapman on the couch.  (*Id*.)

During the summer after Chapman's junior year, Seuffert taught Chapman how to drive her car, which had a manual transmission.  (*Id*. at ¶ 83.)  Throughout Chapman's senior year, Seuffert allowed Chapman to leave school and drive her car to pick up food or run errands.  (*Id*. at ¶ 84.)

Seuffert began visiting Chapman's house late at night.  (*Id*. at ¶ 86.)  Seuffert and Chapman "laid in bed together, cuddled, and engaged in sexual activity in the form of touching each other's breasts and genitals."  (*Id*.)  Seuffert and Chapman did the same at Seuffert's house.  (*Id*. at ¶ 87.)  On one occasion, Seuffert "lifted up Chapman's shirt and began sucking Chapman's bare breast."  (*Id*. at ¶ 88.)  Chapman "was shocked" by Seuffert's "escalation of sexual activity" and "objected."  (*Id*.)  After, Seuffert wrote Chapman several apology letters.  (*Id*. at ¶ 89.)

Weeks later, Chapman and Seuffert again began seeing each other romantically.  (*Id*. at ¶ 90.)  They "routinely kissed one another at their respective homes and occasionally while at school."  (*Id*.)  Chapman also spent weekend nights at Seuffert's house.  (*Id*. at ¶ 91.)  There, they "engaged in sexual activity."  (*Id*.)  Seuffert gave Chapman alcohol at her house and at bars, restaurants, and clubs.  (*Id*. at ¶ 92.)

On New Year's Eve, "Chapman's sister caught Seuffert sleeping with Chapman in her bed."  (*Id*. at ¶ 96.)  Chapman's mother also learned that Seuffert routinely picked up Chapman from Martell's Cleaners.  (*Id*. at ¶ 97.)  She called the school and complained about Seuffert's "interactions with her daughter."  (*Id*.)

Near the end of the school year, Seuffert drove Chapman and "others" to Presque Isle in Pennsylvania on a school day.  (*Id*. at ¶ 98.)  When Seuffert arrived back home from the trip, she had a voicemail from the school asking "whether she and Chapman were together" that day.  (*Id*.)

6

After Chapman graduated from high school, her romantic relationship with Seuffert continued.  (*Id*. at ¶ 101.)

### E.    The Anonymous Letter

In November 2021, Ashtabula received an anonymous letter.  (*Id*. at ¶ 102.)  It detailed Seuffert's "unlawful and unethical behavior with her students, including that she provided them access to [her] house and vehicle, provided them alcohol to consume at her residence, and engaged in sexual activity with them."  (*Id*.)  The letter named Plaintiffs as Seuffert's alleged victims.  (*Id*. at ¶ 103.)

The letter allegedly caused Plaintiffs to "finally recognize that they were the true victims of Seuffert's unlawful and illicit actions, not the wrongdoers."  (*Id*. at ¶ 104.)

After receiving the letter, Ashtabula hired Podojil Consulting and Professional Services ("Podojil") to investigate the allegations therein.  (*Id*. at ¶ 105.)  Podojil interviewed Plaintiffs, who confirmed that the allegations in the letter were true.  (*Id*. at ¶ 106.)  Podojil also interviewed the Male Plaintiffs' basketball coaches.  (*Id*. at ¶ 107.)  The coaches confirmed that they heard the rumors and threatened to suspend the male Plaintiffs if they were true.  (*Id*.)  Lastly, Podojil interviewed Seuffert.  (*Id*. at ¶ 108.)  She denied the allegations in the letter.  (*Id*. at ¶ 109.)

After the Podojil investigation concluded, Ashtabula referred the matter to the Ashtabula County Sheriff's Department.  (*Id*. at ¶¶ 109, 110.)  The Sherriff's Department conducted its own investigation and interviewed the same parties, who provided the same information.  (*Id*. at ¶ 111-113.)

In the summer of 2022, Seuffert resigned from her position on the Ashtabula school board.  (*Id*. at ¶ 114.)

## II.     Procedural History

On May 16, 2023, Plaintiffs filed a twenty-count[3] Complaint against Ashtabula, Seuffert, and "John Does."  (Doc. No. 1.)  The first two counts allege violations of Title IX of the Education Amendments of 1972 ("Title IX").  (*Id.* at ¶¶ 121-151.)  The third and fourth counts arise under 42 U.S.C. § 1983 ("Section 1983").  (*Id.* at ¶¶ 152-164.)  These four federal claims are against all Defendants.  The remaining counts allege violations of state law under various negligence theories, Ohio Rev. Code § 2307.60 (civil action for damages for criminal act), breach of fiduciary duty, and respondeat superior.  (*Id.* at ¶¶ 165-341.)

On July 21, 2023, Ashtabula filed a Motion to Dismiss Plaintiffs' Complaint.  (Doc. No. 10.)  After the Court granted an extension, on August 24, 2023, Plaintiffs filed a Joint Memorandum in Opposition to Ashtabula's Motion.  (Doc. No. 17.)  And, on September 7, 2023, Ashtabula filed a Reply in support of its Motion.  (Doc. No. 19.)

On August 25, 2023, Plaintiffs served Seuffert.  (Doc. No. 18.)  On September 25, 2023, Seuffert's counsel entered a notice of appearance and requested forty-five days to respond to Plaintiffs' Complaint, which the Court granted.  (Doc. Nos. 20, 21, 22.)  On November 13, 2023, Seuffert filed a Motion to Dismiss Plaintiffs' Complaint.  (Doc. No. 23.)  On December 8, 2023, Plaintiffs filed a Joint Memorandum in Opposition.  (Doc. No. 25.)  Seuffert did not file a reply.

## III.     Law and Analysis

Seuffert's Motion challenges the Court's subject-matter jurisdiction, so the Court will address it first.

---

[3]  The Counts are numbered I through XXI, but there is no Count XIX.

8

**A.      Seuffert's Motion to Dismiss under Rules 12(b)(1), (6), and (7)**

In her Motion to Dismiss, Seuffert writes that "[t]o the extent applicable," she joins Ashtabula's Motion to Dismiss under Rule 12(b)(6). (Doc. No. 23, PageID# 140.) She also asserts, however, that this Court lacks subject-matter jurisdiction and that Plaintiffs have failed to join necessary and indispensable parties. (*Id*. at PageID# 143, 145.)

A federal court that lacks subject-matter jurisdiction "lacks the power to hear a case." *King v. United States*, 917 F.3d 409, 420 (6th Cir. 2019) (citing *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1869)). Seuffert argues that this Court lacks subject-matter jurisdiction because "Plaintiffs are unable to raise a federal question." (Doc. No. 23, PageID# 143.)

A district court has subject-matter jurisdiction where the complaint raises a federal question. 28 U.S.C. § 1331. Here, Plaintiffs bring claims under Title IX and Section 1983. (Doc. No. 1, ¶¶ 121-164.) The Court has federal-question jurisdiction over these claims. A district court that has federal-question jurisdiction over a plaintiff's federal claims has discretion to exercise supplemental jurisdiction over a plaintiff's state-law claims. 28 U.S.C. § 1367(a); *Republic Bldg. Co. v. Charter Twp. of Clinton*, 81 F.4th 662, 666 (6th Cir. 2023). Plaintiffs also bring state-law claims. The Court can exercise supplemental jurisdiction over these claims.

Accordingly, the Court concludes that it has subject-matter jurisdiction and DENIES Seuffert's Motion to Dismiss under Rule 12(b)(1). For the reasons in the next section, the Court DENIES as moot Seuffert's Motion to Dismiss under Rule 12(b)(7).

**B.    Ashtabula's Motion to Dismiss under Rule 12(b)(6)**

Ashtabula moves to dismiss all of Plaintiffs' claims against it—both federal and state-law—under Rule 12(b)(6).  (Doc. No. 10.)  As Plaintiffs' Title IX claims are at the center of their Complaint, the Court will begin there.

**1.    Rule 12(b)(6) Standard**

Under Rule 12(b)(6), the Court accepts Plaintiffs' factual allegations as true and construes the Complaint in the light most favorable to them.  *See Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009).  To survive a motion to dismiss under this Rule, "a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'a formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'"  *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)).

The measure of a Rule 12(b)(6) challenge—whether a complaint raises a right to relief above the speculative level— "does not 'require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.'"  *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting *Twombly*, 550 U.S. at 555-56).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Deciding whether a complaint states a claim for relief that is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id*. at 679.

Consequently, examination of a complaint for a plausible claim for relief is undertaken in conjunction with the "well-established principle that Federal Rule of Civil Procedure 8(a)(2) requires

10

only a short and plain statement of the claim showing that the pleader is entitled to relief. Specific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Gunasekera*, 551 F.3d at 466 (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)) (internal quotation marks omitted). Nonetheless, while "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 679.

### 2. Title IX Claim

In Count I of their Complaint, Plaintiffs assert a violation of Title IX against all Defendants. (Doc. No. 1.) They allege that "Seuffert's sexual abuse, which included making sexually explicit comments . . ., grooming . . ., and engaging in sexual activity . . . was sex discrimination under Title IX." (*Id*. at ¶ 130.) They further allege that Ashtabula had "actual knowledge" of Seuffert's sexual abuse, but "remained willfully ignorant of Seuffert's abuse towards [Plaintiffs]" and "did nothing to address Seuffert's misconduct." (*Id*. at ¶ 134.) Lastly, they allege that Ashtabula's "failure to promptly and appropriately investigate, remedy, and respond to Seuffert's misconduct caused Plaintiffs to experience further sexual harassment and/or made them liable or vulnerable to it." (*Id*. at ¶ 140.)

In short, Plaintiffs allege that Ashtabula was "deliberately indifferent to known acts of teacher-student sexual discrimination." *See Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 643 (1999). Such a claim requires that Plaintiffs plead that "(1) [they] [were] sexually harassed by a teacher or professor, (2) an official with authority to take corrective action had actual notice of the harassment, (3) the school's response was clearly unreasonable, and (4) the school's deliberate

indifference caused [them] to suffer discrimination." *Wamer v. Univ. of Toledo*, 27 F.4th 461, 471 (6th Cir. 2022). Plaintiffs can satisfy element four—causation—by alleging either that "(1) following the school's unreasonable response (2) (a) [Plaintiffs] experienced an additional instance of harassment or (b) an objectively reasonable fear of further harassment caused [Plaintiffs] to take specific reasonable actions to avoid harassment, which deprived [Plaintiffs] of the educational opportunities available to other students." *Id*.

As an initial matter, "there is no individual liability under Title IX." *Bose v. Bea*, 947 F.3d 983, 989 (6th Cir. 2020). This means that only Ashtabula "'may be liable in damages under Title IX' and 'only for its own misconduct.'" *Id*. (quoting *Davis*, 526 U.S. at 640.) Accordingly, the Court dismisses Seuffert and the "John Does" from Count I.

As for Ashtabula, it moves to dismiss Plaintiffs' Title IX claim for two reasons: (1) Plaintiffs have failed to plead a plausible Title IX claim because they do not allege that an individual with authority at Ashtabula had actual notice of Seuffert's alleged sexual misconduct (the second element); and (2) Plaintiffs claims are time-barred. (Doc. No. 10, PageID# 76, 78, 81.)

For the following reasons, the Court concludes that while Plaintiffs have plausibly plead actual notice, their Title IX claim is time-barred.

### a)   Actual Notice

Actual notice (or knowledge) requires that an "'appropriate person' at a school know[] about sexual discrimination." *Kesterson v. Kent State Univ.*, 967 F.3d 519, 527 (6th Cir. 2020) (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)). An appropriate person "is someone who 'at a minimum has authority to address the alleged discrimination on the school's behalf.'" *Id*. (citing *Gebser*, 524 U.S. at 290) (ellipsis and brackets omitted). Having an obligation to report sexual

discrimination allegations is not enough. *Id*. at 529. The person must be able to "act on [the school's] behalf." *Id*. Put differently, the person must be "'high enough up the chain-of-command' that her decision constitutes the school's decision." *Id*.

At the motion to dismiss stage, this means Plaintiffs must plausibly allege (1) the identity of an "appropriate person," namely someone who "has authority to address the alleged discrimination on the school's behalf" and (2) that the actual notice was sufficient to alert the appropriate person of the possibility of Plaintiffs' sexual harassment. *See DeMarcus v. Univ. of S. Ala.*, 2023 U.S. Dist. LEXIS 51317 at *33 (S.D. Ala. Mar. 27, 2023) (citing *Doe v. Sch. Bd.*, 604 F.3d 1248, 1254 (11th Cir. 2010)); *see also Doe v. Hamilton Cty. Bd. of Educ.*, 329 F. Supp. 3d 543, 564 (E.D. Tenn. 2018) ("actual notice . . . is ultimately a matter of who knew what and when").

Plaintiffs argue that the following allegations plausibly allege actual notice: (1) the head coach and the assistant coach of the basketball team heard "allegations/rumors" that Seuffert was providing alcohol and sex to students[4] (Doc. No. 1, ¶ 39, 40, 107, 112); (2) Chapman's mother called "the school" to complain that "Seuffert routinely picked up Chapman . . . for no apparent educational reason" (*id*. at ¶ 97); (3) "various teachers" stopped accepting Chapman's "hall and/or late passes" from Seuffert (*id*. at ¶ 74); (4) Seuffert "occasionally" drove Chapman home from volleyball games while Chapman's teammates rode the bus (*id*. at ¶ 69); and (5) when Seuffert and Chapman skipped school and went to Presque Isle, "the school" left Seuffert a voicemail asking, "whether she and Chapman were together" (*id*. at ¶ 98). (Doc. No. 17, PageID# 111.)

---

[4] Plaintiffs allege that the head coach heard "rumors/allegations that Seuffert was providing alcohol and sex" while the assistant coach heard only "allegations/rumors that Seuffert was providing alcohol." (Doc. No. 1, ¶ 39, 40.) However, Plaintiffs later allege that during the investigations in 2021 and 2022, the head coach and the assistant coach "confirmed that they heard the rumors." (*Id*. at ¶ 107, 112.) Reading these allegations together, the Court can reasonably infer that both the head coach and the assistant coach heard allegations that Seuffert was providing alcohol *and* sex to Plaintiffs.

Only the first of these allegations plausibly alleges both the who—the basketball coaches—and the what— "allegations/rumors" of "alcohol and sex."  The remainder fail to allege the identity of the person who received the actual notice, and they fail to allege that the notice allegedly received was of sexual harassment.  As for the basketball coaches, Ashtabula argues that they "are not 'appropriate persons' as a matter of law," citing *Kesterson*, 967 F.3d at 528-29, for this proposition. (Doc. No. 10, PageID# 76.)  And even if they are appropriate persons, Ashtabula contends that they only had knowledge of "rumors," which the Male Plaintiffs denied, and "rumors and innuendo" are not "actual knowledge on the part of Ashtabula."  (Doc. No. 19, PageID# 128.)

First, Ashtabula's reliance on *Kesterson* is misplaced.  The court in *Kesterson* decided the plaintiff's Title IX claim on a complete factual record at summary judgment, not on a motion to dismiss.  967 F.3d at 523.  Who is an "appropriate person" under Title IX is "'necessarily a fact-based inquiry' because 'officials' roles vary among school districts.'"  *Doe v. Sch. Bd.*, 604 F.3d at 1256; *see also Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 360 (5th Cir. 2020) ("Determining whether someone is an official with authority to institute corrective measures is a fact-specific inquiry."); *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1247 (10th Cir. 1999) (same).  At this stage, the Court does not have a factual record, and it must accept the factual allegations in Plaintiff's Complaint "as true" and construe them in Plaintiffs' favor.  *Gunasekera*, 551 F.3d at 466.  Here, Plaintiffs allege that the coaches knew of "allegations/rumors" that Seuffert was providing alcohol and sex to "high school students."  (Doc. No. 1, ¶¶ 39, 40.)  The coaches asked Plaintiffs about the allegations and "threatened to suspend the players from the team" and "threatened [them] to keep their mouths shut."[5]

---

[5]  Plaintiffs allege that it was only the head coach that "threatened" the Male Plaintiffs.  (Doc. No. 1, ¶ 39.)  But they later allege that Ashtabula "through its employees and/or agents" threatened the Male Plaintiffs, that the Male Plaintiffs denied the allegations "when asked by their coaches," and that during the investigations in 2021 and 2022, both the head coach

(*Id*. at ¶¶ 39, 41.) From the coaches' alleged actions to address Seuffert's sexual harassment, the Court can draw the reasonable inference that the coaches had "the authority to take corrective actions on [Ashtabula's] behalf to remedy the sexual discrimination [Plaintiffs] faced." *Kesterson*, 967 F.3d at 528. Plaintiffs have thus plausibly alleged that the coaches are "appropriate persons."

Second, Plaintiffs allege more than rumors—they allege that the coaches heard "allegations" of Seuffert's sexual harassment. An allegation is like a report, and a report of sexual harassment to an appropriate person can provide actual notice. *See Dahmer v. W. Ky. Univ.*, 2022 U.S. App. LEXIS 28533 at *9 (6th Cir. Oct. 13, 2022); *see also* ALLEGATION, Black's Law Dictionary (11th ed. 2019) (defining allegation as "a statement, not yet proved, that someone has done something wrong or illegal"). Plaintiffs allege that the allegations were that Seuffert was generally providing alcohol and sex to "high school students." (Doc. No. 1, ¶ 39, 40.) And they allege that the Male Plaintiffs and Chapman went to Seuffert's house together. (*Id*. at ¶ 25.) From these allegations the Court can reasonably infer that what the coaches heard included not only Seuffert's sexual harassment of the Male Plaintiffs, but Seuffert's sexual harassment of Chapman as well.

Accordingly, at this stage, the Court concludes that Plaintiffs have plausibly alleged that appropriate persons—the basketball coaches—had actual notice of Seuffert's alleged sexual harassment of Plaintiffs.

### b) Accrual of Title IX Claims

Even so, for the reasons that follow, the Court concludes that Plaintiffs' claims accrued decades ago and are now time-barred.

---

and the assistant coach confirmed that they "threatened to suspend the players." (*Id*. at ¶ 41, 44, 107, 112.) Reading these allegations together, the Court can reasonably infer that both the head coach and the assistant coach threatened the Male Plaintiffs with suspension.

A Rule 12(b)(6) motion is generally an "'inappropriate vehicle' for dismissing a claim based upon a statute of limitations." *Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 464 (6th Cir. 2013) (quoting *Cataldo v. United States Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012)).  Dismissal is appropriate, however, if the plaintiff's own allegations "in the complaint show that the claim is time-barred." *Id*. (quoting *Cataldo*, 676 F.3d at 547).  The statute of limitations is an affirmative defense, and the burden is on Ashtabula to show that it has run. *Id*.

Title IX does not have its own statute of limitations. *Lillard v. Shelby Cty. Bd. of Educ.*, 76 F.3d 716, 728 (6th Cir. 1996).  Rather, it "borrows from Ohio's two-year statute of limitations for personal injury claims." *Snyder-Hill v. Ohio State Univ.*, 48 F.4th 686, 698 (6th Cir. 2022).  When the statute of limitations begins to run (i.e., accrue), however, is a question of federal law. *Id*.

In *Snyder-Hill*, the 6th Circuit held that "the discovery rule determines the accrual of Title IX claims." 48 F.4th at 701.  The discovery rule provides that "the statute of limitations begins to run when the reasonable person knows, or in the exercise of due diligence should have known, both his injury and the cause of that injury." *Id*. at 698.  In the Title IX context, the "injury" is "the school's actions or inactions, not the actions of the person who abused the plaintiff." *Id*. at 702.  Thus, Plaintiffs' Title IX claim "accrue[d] when [Plaintiffs] [knew] or [had] reason to know that [Ashtabula] injured them." *Id*. at 701.

The parties dispute when that point was.  Plaintiffs argue that their claims accrued in 2022 after Ashtabula received the anonymous letter and the resulting investigations concluded.  Before this point, Plaintiffs contend, they "were led to believe . . . that they were not victims, and, thus, led to believe there was no wrongdoing by Ashtabula." (Doc. No. 17, PageID# 117.)  Plaintiffs argue that the facts of this case are analogous to the facts of *Snyder-Hill*. (*Id*. at PageID# 114.)

16

Ashtabula responds that the Male Plaintiffs' claims accrued when their basketball coaches "confronted them" about the rumors of sexual misconduct. (Doc. No. 10, PageID# 79.) As for Chapman, Ashtabula argues that, "[a]t minimum," her claims accrued "when she turned eighteen and was employed by Ashtabula as an assistant volleyball coach around 1990." (*Id*. at PageID# 81.) Ashtabula argues that this case is distinguishable from *Snyder-Hill*.

In *Snyder-Hill*, the plaintiffs sued the Ohio State University under Title IX for its deliberate indifference to Richard Strauss's alleged sexual abuse of hundreds of male students between 1978 and 1998. 48 F.4th at 689-90. Strauss was a team physician who allegedly abused the students during medical examinations. *Id*. at 690. In 2018, Ohio State commissioned an independent investigation, which found that Ohio State received regular complaints from students about Strauss but took no meaningful action and actively concealed his abuse. *Id*. at 691-93.

The *Snyder-Hill* plaintiffs brought both pre- and post-assault Title IX claims. *Snyder-Hill v. Ohio State Univ.*, 2021 U.S. Dist. LEXIS 254453 at *2 (S.D. Ohio Sep. 22, 2021); *Moxley v. Ohio State Univ.*, 2021 U.S. Dist. LEXIS 254384 at *2 (S.D. Ohio Oct. 25, 2021). "A post-assault claim alleges that a school's response to a complaint of sexual misconduct violated Title IX; a pre-assault claim alleges that the school maintained a policy of deliberate indifference to sexual harassment that created a heightened risk of it and, ultimately, led to a plaintiff's particular harassment." *Karasek v. Regents of the Univ. of Cal.*, 500 F. Supp. 3d 967, 970 (N.D. Cal. 2020), *cited in Snyder-Hill*, 48 F.4th at 703. The district court dismissed both types of claims as time-barred. *Snyder-Hill*, 2021 U.S. Dist. LEXIS 254453 at *2-3; *Moxley*, 2021 U.S. Dist. LEXIS 254384 at *2.

The Sixth Circuit reversed "for three independent reasons:" the plaintiffs plausibly alleged that, first, "they did not know and lacked reason to know that Ohio State caused their injury;" second,

17

"even if they had investigated further, they could not have learned of Ohio State's conduct," and third, "they did not know that they were abused." *Snyder-Hill*, 48 F.4th at 706-07. The court distinguished the plaintiffs' pre- and post-assault claims, explaining that:

> [A] pre-assault heightened-risk claim may not accrue until well after a post-assault Title IX claim. A plaintiff will typically know or have reason to know that a school mishandles their own report of an assault close to the time of the school's inadequate response. But that same plaintiff may have no reason to know of a school's deliberate indifference that gave rise to their heightened-risk claim. It would be "unreasonable to conclude . . . that a plaintiff's knowledge that [their] individual complaint was mishandled would reveal that the University has a broad de facto policy of deliberate indifference generally." *Karasek*, 500 F. Supp. 3d at 981. This difference distinguishes the plaintiffs' claims from *King-White* [*v. Humble Indep. Sch. Dist.*], 803 F.3d [754,] 763 [5th Cir. 2015], in which the Fifth Circuit held that the plaintiffs' post-assault claims accrued when their complaints to the school administrations went "unheeded." In short, even if a plaintiff has reason to know that a school responded improperly to their complaint, they may still lack reason to know that others had complained before them or that the school was deliberately indifferent to any prior complaints.

*Id.* at 704; *see also Snyder-Hill v. Ohio State Univ.*, 54 F.4th 963, 967 (6th Cir. 2022) (Moore, J. concurring in the denial of rehearing en banc and restating that the plaintiffs' claims at issue in *Snyder-Hill* were pre-assault and distinguishable from the post-assault claims in *King-White*).

Here, Plaintiffs bring only a post-assault Title IX claim. They allege that Ashtabula had "actual knowledge" of Seuffert's abuse of Plaintiffs yet Ashtabula "fail[ed] to respond promptly and adequately," which "constitutes sex discrimination, in violation of Title IX." (Doc. No. 1, ¶¶ 132, 138.) More to the point, they do *not* allege that Ashtabula maintained a policy of deliberate indifference to sexual harassment that created a heightened risk of it and led to Plaintiffs' own harassment, as would be necessary to plausibly allege a pre-assault heightened risk claim. So, this case is more similar to *King-White*, 803 F.3d 754, which the *Snyder-Hill* court distinguished, than it is to *Snyder-Hill* itself.

18

With this in mind, the Court will separately examine when the Male Plaintiffs' and Chapman's Title IX claims accrued.

The Male Plaintiffs allege that they, like the plaintiffs in *Snyder-Hill*, did not know that they were abused.  (Doc. No. 1, ¶¶ 104; Doc. No. 17, PageID# 116.)  As such, they contend that their claims accrued in 2022 when the allegations against Seuffert "became public" and they "finally recognized that they were the true victims of Seuffert's unlawful and illicit actions."  (Doc. No. 1, ¶ 104.)  But there are fundamental differences between the alleged facts in this case and the alleged facts in *Snyder-Hill*.  First, the abuser in *Snyder-Hill* was a physician who "gave pretextual medical explanations for his abuse."  48 F.4th at 706.  Second, Strauss—as a physician—was "expected to touch a person's sexual organs," and the plaintiffs "lack[ed] the training to know whether an examination [was] medically appropriate."  *Id*.  Lastly, Ohio State "gave Strauss its stamp of approval, and trusted adult professionals routinely told the plaintiffs that Strauss's conduct was normal."  *Id*.

Here, there is no allegation that Seuffert gave "pretextual" explanations for her abuse.  Nor was she—as a teacher—expected to touch the Male Plaintiffs' "sexual organs."  And there is no allegation that other "trusted adult professionals" told the Male Plaintiffs that Seuffert's conduct was normal.  It is true that the Male Plaintiffs were "young, untrained, and unexperienced" at the time of their alleged abuse, like the plaintiffs in *Snyder-Hill*.  *Id*.  But the alleged victim in *King-White* was young as well.  803 F.3d at 756.  In fact, the alleged victim in *King-White* was 16 years old when her abuse began, more similar in age to the Male Plaintiffs.  *Id*.  In short, none of the alleged facts that made the *Snyder-Hill* plaintiffs' ignorance of their own abuse plausible are present in this case.  This case is therefore distinguishable from *Snyder-Hill*, and it is implausible that the Male Plaintiffs did not know that Seuffert abused them.  *See United States ex rel. Sheldon v. Kettering Health Network*,

19

816 F.3d 399, 409 (6th Cir. 2016) (stating that a court need not accept as true facially implausible factual allegations).

However, the Male Plaintiffs' knowledge that they were abused "is not enough to start the clock." *Snyder-Hill*, 48 F.4th at 705. Rather, the statute of limitations clock started when they knew or should have known that "appropriate persons" at Ashtabula knew of Seuffert's misconduct and failed to appropriately respond. *See id*. That analysis is straightforward when the Court accepts, as it must, that the Male Plaintiffs' allegations in their Complaint are true. *See Lutz*, 717 F.3d at 464. The Male Plaintiffs allege that their basketball coaches became aware of Seuffert's conduct around 1989 or 1990. (Doc. No. 1, ¶¶ 39, 40, 46.) And the Court agrees with Plaintiffs' that it is reasonable to infer at this stage that the coaches were "appropriate persons." After hearing the allegations, the coaches confronted the Male Plaintiffs and threatened that they would suspend them from the basketball team if the allegations were true. (*Id*. at ¶ 39) Understandably, the Male Plaintiffs denied the allegations. (*Id*. at ¶ 44.) All the same, at that point, the Male Plaintiffs knew that Ashtabula was aware of Seuffert's sexual misconduct. And they knew that Ashtabula, rather than appropriately respond to the allegations, blamed them for what Seuffert did. Stated succinctly, when the coaches confronted them, the Male Plaintiffs knew or reasonably should have known that Seuffert's misconduct had gone "unheeded." *Snyder-Hill*, 48 F.4th at 704; *see also King-White*, 803 F.3d at 763. It was then that their Title IX claims accrued. Their Title IX claims are therefore barred by the statute of limitations.

As for Chapman, like the Male Plaintiffs, it is implausible that she was unaware of her abuse. However, identifying when she knew or should have known that Ashtabula failed to appropriately respond to her abuse is less straightforward. Unlike the Male Plaintiffs, no one ever confronted

Chapman about Seuffert's abuse. Nor is it alleged that Chapman ever complained about Seuffert to Ashtabula. So, when did Chapman—or her mother while Chapman was a minor—"discover[]" or, with reasonable diligence, when "[should] [she] have 'discover[ed] the facts constituting [Ashtabula's] violation'" of Title IX? *Snyder-Hill*, 48 F.4th at 705 (quoting *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010)); *see also Haines v. Metro. Gov't of Davidson Cty.*, 32 F. Supp. 2d 991, 1000 (M.D. Tenn. 1998) ("[I]t is well-established that a parent . . . has standing to assert a claim under Title IX" on the student's behalf.). One point in 1988, during Chapman's senior year, provides the answer.

Plaintiffs allege that "Seuffert often picked up Chapman from Martell's Cleaners, which was located down the road from Chapman's home, and brought Chapman back to her house." (*Id*. at ¶ 78.) At some point in early 1988, Chapman's mother "discover[ed] that Seuffert routinely picked up Chapman from Martell's Cleaners for no apparent educational reason." (*Id*. at ¶ 97.) This led her to "call[] the school to complain about Seuffert's interactions with her daughter." (*Id*.) Yet her complaint went unheeded, and Seuffert's alleged abuse of Chapman continued. (*See id*. at ¶ 99.) In *King-White*, the alleged victim, with her mother's permission, moved into her abuser's home. 803 F.3d at 757. The court concluded that "a reasonable person who knew that her daughter was living with a teacher, and who had already lodged complaints with administrators that had gone unheeded, would have investigated further." *Id*. at 763. Similarly, at this point in 1988, Chapman's mother knew that Seuffert was picking up her daughter for no "educational reason," and she knew that her complaint to Ashtabula had gone unheeded. A reasonable person would have investigated further. And unlike in *Snyder-Hill*, Plaintiffs do not allege that Ashtabula "concealed" Seuffert's abuse by, for example, "destroy[ing] records," "g[iving] . . . false performance reviews," or "actively

mis[leading] students" such that "[Plaintiffs] could not have reasonably discovered [Ashtabula's] conduct." 48 F.4th at 706.  Accordingly, Chapman's Title IX claim accrued at this point and is also now time-barred.

Plaintiffs resist this conclusion, comparing their allegations to *Snyder-Hill* and arguing that "it was not until the anonymous letter and subsequent investigations that [Plaintiffs] learned and understood the full magnitude of Ashtabula's previous knowledge and [its] failure to remedy the situation." (Doc. No. 17, PageID# 118 (citing Doc. No. 1, ¶¶ 102-112).)  But Plaintiffs fail to distinguish between their post-assault claim and the pre-assault claims at issue in *Snyder-Hill*.  A pre-assault claim requires a plaintiff to show that a school "has a broad de facto policy of deliberate indifference generally." *Snyder-Hill*, 48 F.4th at 704 (quoting *Karasek*, 500 F. Supp. 3d at 981).  A post-assault claim only requires that a plaintiff know "that a school mishandles [her] own report of an assault." *Id*.  The 2018 investigation in *Snyder-Hill* was critical because it showed that Ohio State administrators not only knew of Strauss's abuse but also "enabled and perpetuated the abuse" through a "decades-long cover up." 48 F.4th at 695, 705.  In other words, it showed that Ohio State had a policy of deliberate indifference to Strauss's abuse.

Here, the anonymous letter merely reiterated the alleged abuse that Seuffert committed, which Plaintiffs were already aware of: namely that Seuffert "provided them access to [her] house and vehicle, provided them alcohol to consume at her residence, and engaged in sexual activity." (Doc. No. 1, ¶ 102.)  The subsequent investigations confirmed that the basketball coaches "heard rumors" of Seuffert's abuse and "threatened to suspend" the Male Plaintiffs from the basketball team. (*Id*. at ¶¶ 107, 112.)  But the Male Plaintiffs were already aware of this decades ago in 1989 or 1990. (*Id*. at ¶ 46.)  Notably, neither the anonymous letter nor the subsequent investigations revealed that

22

Ashtabula had a "policy of deliberate indifference that created a heightened risk of harassment" as did the investigation in *Snyder-Hill*.  48 F.4th at 703 (quoting *Karasek*, 500 F. Supp 3d at 979).

Snyder-Hill is distinguishable for another reason.  The *Snyder-Hill* plaintiffs alleged "varying degrees of knowledge about whether *others* knew of Strauss's conduct."  48 F.4th at 695.  Some "did not know that Strauss had behaved similarly toward other students," while others had greater "snippets of knowledge."  *Id*. at 695, 705.  It was not until the 2018 investigation that each individual plaintiff knew the full extent of Ohio State's cover-up.  Not so here.  Plaintiffs allege that Chapman introduced the Male Plaintiffs to Seuffert.  (*Id*. at ¶ 25.)  And they allege that "Seuffert had the *Plaintiffs* over several times per week," that "Seuffert became more and more promiscuous with the *Plaintiffs*," and that "[t]he sexual activity occurred during times that Seuffert provided the *Plaintiffs* with alcohol."  (*Id*. at ¶¶ 30, 33 (emphases added).)  The reasonable inference from these allegations is that *all* Plaintiffs were at Seuffert's house together when Seuffert gave them alcohol and sexually harassed them.  That means that *all* Plaintiffs were aware of each other's sexual abuse at the hands of Seuffert.  In other words, all Plaintiffs were already aware in 1989 or 1990 of the full extent of Seuffert's and Ashtabula's alleged misconduct, and neither the anonymous letter nor the subsequent investigations added to that awareness.

Accordingly, Plaintiffs' argument that this case is like *Snyder-Hill*, and therefore their claims accrued in 2022, lacks merit.

### 3.    Title IX Retaliation, Section 1983, and *Monell* Claims

In Counts II, III, and IV, Plaintiffs allege retaliation under Title IX, denial of due process under the Fifth and Fourteenth Amendments for "failure to comply with the administrative requirements of Title IX," and *Monell* liability for "failure to comply with Title IX," respectively.

The parties agree that since these Counts are predicated on Count I, they rise or fall with it. (*See* Doc. No. 10, PageID# 82-83; Doc. No. 17, PageID# 113.) Because the Court has concluded that Count I is barred by the statute of limitations, it dismisses Counts II through IV—Plaintiffs' remaining federal claims—on the same grounds.

### 4. Supplemental Jurisdiction

This Court "has discretion as to whether to exercise supplemental jurisdiction after dismissing the claims over which it has original jurisdiction." *Miller v. Collins*, 2023 U.S. App. LEXIS 29681 at *10 (6th Cir. Nov. 6, 2023) (citing 28 U.S.C. § 1367(c)(3)). "When deciding whether to exercise supplemental jurisdiction, courts consider and weigh 'the values of judicial economy, convenience, fairness, and comity.'" *Id*. (quoting *Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010)).

"When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims." *Musson Theatrical v. Fed. Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996). Here, after considering and weighing the above factors, the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims and dismisses those claims without prejudice.

## IV. Conclusion

For the foregoing reasons, the Court GRANTS Ashtabula's Motion to Dismiss Plaintiffs' federal claims under Rule 12(b)(6). (Doc. No. 10.) The Court GRANTS IN PART Seuffert's Motion to Dismiss to the extent she joins Ashtabula's Motion to Dismiss under Rule 12(b)(6), but it DENIES IN PART Seuffert's Motion to Dismiss under Rules 12(b)(1) and (7). (Doc. No. 23.) Lastly, the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state-law claims and dismisses them without prejudice.

**IT IS SO ORDERED.**

Dated: January 26, 2024                      _s/ Pamela A. Barker_____
                                             PAMELA A. BARKER
                                             UNITED STATES DISTRICT JUDGE